872 F.2d 1028
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James SAYLOR and Kaaren Saylor d/b/a UDDER NONSENSE DAIRY,
Defendants, Counterplaintiffs-Third-Party
Plaintiffs-Appellees,
v.
A.O. SMITH HARVESTORE PRODUCTS, INC., (87-5990/80-5279),
Hermitage Harvestore Systems, Inc., and Chuck
Dowdy (87-6002/88-5314), Third-Party
Defendants-Appellants.
 Nos. 87-5990, 87-6002, 88-5279 and 88-5314.
 United States Court of Appeals, Sixth Circuit.
 April 26, 1989.
 
 Before KEITH, NATHANIEL K. JONES and RALPH B. GUY, Jr., Circuit Judges.
 PER CURIAM.
 
 
 1
 The third-party defendants appeal the jury verdict for the third-party plaintiffs, including the pre-judgment interest award, in this diversity action for strict product liability and fraudulent misrepresentation. For the reasons that follow, we affirm the district court's judgment as to the liability and compensatory damages issues. However, because the record reflects that the pre-judgment interest award was improperly calculated, we find it necessary to order a remittitur of a portion of that award.
 
 I.
 
 2
 At all times relevant to this lawsuit, the third-party plaintiffs-appellees, James and Kaaren Saylor ("the Saylors") were the owners and operators of the "Udder Nonsense Dairy" in New Bedford County, Tennessee. Third-party defendant-appellant, A.O. Smith Harvestore Products, Inc. ("AOSHPI"), is a New York corporation engaged in the design and manufacture of farm feed storage systems. Third-party defendant-appellant Hermitage Harvestore Products, Inc. ("Hermitage") is a Tennessee corporation engaged in the business of selling and distributing Harvestore systems designed and manufactured by AOSHPI. Third-party defendant-appellant Chuck Dowdy ("Dowdy") is a sales agent for Hermitage.
 
 
 3
 In January or February of 1980, the Saylors were approached by Dowdy about purchasing Harvestore feed storage structures and related equipment manufactured by AOSHPI for use on their dairy farm. The Harvestore system was represented through AOSHPI literature and by Dowdy as an "oxygen limiting" system which was designed to keep stored feed virtually airtight, thereby preventing spoilage and yielding better feed and increased milk production. Dowdy showed the Saylors an AOSHPI film and a book published by AOSHPI, both of which touted the oxygen limiting capabilities of Harvestore structures. The promotional material defined "oxygen limiting" as "[a] feed storage system in which ensiled feeds are protected from the access of oxygen."
 
 
 4
 In March of 1980, the Saylors signed an agreement with Hermitage to obtain the Harvestore system. In May of 1980, the Saylors entered a long-term lease with AgriStor Leasing Company ("AgriStor"), which financed the arrangement. The Harvestore structures were in place and operating on the Saylors' farm by July of 1980. After the first month, however, James Saylor began noticing problems in the dairy herd, including decreased milk production, a lack of energy in the cows, and swelling in their joints.
 
 
 5
 During 1981 several veterinarians came to the Saylors' farm and examined the dairy herd; however, none of them could determine the source of the problem. Although the Saylors stopped using the Harvestore structures in February of 1982, the health of the herd continued to decline, resulting in lower milk productivity and the death of a number of cows. Eventually, the Saylors were forced to slaughter the dairy herd and close down their farm. When they defaulted on their lease payments, Agristor repossessed the equipment.
 
 
 6
 On October 28, 1983, AgriStor filed suit against the Saylors in the United States District Court for the Eastern District of Tennessee, seeking the balance due under the lease. The Saylors answered and filed a third-party complaint against Dowdy, Hermitage and AOSHPI, seeking damages for manufacturing a defective product, and for false and fraudulent misrepresentations about the product. At the beginning of the trial, the Saylors confessed judgment on the AgriStor claim, and the district court granted summary judgment to AgriStor for the remaining payments under the lease. The case was tried to a jury on the Saylors' claims of a defective product and fraudulent misrepresentation. The jury found the defendants jointly and severally liable to the Saylors, and awarded compensatory and punitive damages in the amount of $1 million.
 
 
 7
 The defendants appealed the judgment to this court, arguing that the district court had erred in refusing to give a jury instruction on the statute of limitations, and in refusing to direct a verdict in defendants' favor on the fraudulent misrepresentation claims. Regarding the latter issue, the defendants argued that certain language in the lease agreement expressly disclaimed that the Saylors had relied upon any representations made by the defendants in purchasing the Harvestore equipment. The defendants contended that this contractual language precluded the Saylors from proving reliance, thereby foreclosing their fraudulent misrepresentation claims.
 
 
 8
 This court reversed the district court's judgment and remanded, agreeing with the defendants that the jury should have been instructed on the statute of limitations issue. Agristor Leasing v. James Saylor, 803 F.2d 1401, 1405-06 (6th Cir.1986) ("Saylor I "). However, we rejected the defendants' assertions regarding the force of the "disclaimer-of-reliance" language in the contract. Noting a split of authority in Tennessee as to whether such disclaimers were effective to shield a defendant from liability for fraud, this court deferred to the district judge's interpretation of state law and concluded that "the district court did not err in denying summary judgment and a directed verdict on the basis of the disclaimers of reliance." Id. at 1407.
 
 
 9
 On remand, the defendants filed a motion in limine seeking to prevent any reference to the prior proceedings in the presence of the jury. This motion was granted. In addition, the defendants sought to preclude the Saylors from presenting evidence regarding pre-judgment interest damages. The district court ultimately granted this motion, stating that if the jury awarded compensatory damages, the court would decide whether pre-judgment interest should be awarded and in what amount.
 
 
 10
 The second trial commenced on June 8, 1987. In the second week of trial, during a brief recess in the proceedings, one of the jurors was approached by an old acquaintance who was a spectator at the trial. The spectator, who was a blood relative of one of the Saylors' expert witnesses, greeted the juror in the restroom and told the juror that she had "sat through this whole case two years ago." The juror promptly told the spectator that she was not allowed to talk about the case and walked out of the restroom. The juror then informed the court marshal about what had taken place, and the marshal informed the court and counsel for the parties. Counsel for the defendants questioned the spectator about the incident, but did not ask that the juror be replaced, or request any other relief at that time. According to the defendants, they did not learn of the spectator's relation to the Saylors' witness until the trial had concluded.
 
 
 11
 At the close of the evidence, the defendants moved for a directed verdict on the fraudulent misrepresentation claims, again asserting that the disclaimer language in the lease contract precluded the Saylors from recovering on those claims. This motion was denied. The defendants also requested that the jury be given a special verdict form, citing the fact that multiple claims were being asserted against multiple defendants. The district court also denied this request.
 
 
 12
 Despite his pre-trial evidentiary ruling concerning pre-judgment interest, and despite reaffirming that ruling during trial, the district judge decided at the close of the proofs to submit this issue to the jury. The district judge therefore instructed the jury, in accordance with Tennessee law, that they possessed the discretion whether to award pre-judgment interest, and that they could award such interest on the amount of compensatory damages "at any rate of interest [they found] to be appropriate up to but not greater than 10 percent per annum." J.App. at 484-85.
 
 
 13
 On June 24, 1987, the jury returned a general liability verdict against all defendants, awarding the Saylors $875,000.00 in compensatory damages and $490,000.00 in pre-judgment interest. The latter figure represented interest at the rate of 8 percent per year on $875,000.00 over seven years.
 
 
 14
 The defendants filed various post-trial motions, including a motion for judgment notwithstanding the verdict and a motion for a remittitur of the damages award. In addition, the defendants filed a motion seeking to interview the jurors concerning the extraneous juror contact, as well as a motion for a judicial inquiry into this matter. While all of these motions were denied initially, the district judge later decided to conduct an inquiry into the circumstances surrounding the extraneous juror contact.
 
 
 15
 On January 21, 1988, the district judge conducted an inquiry at which each of the jurors was examined individually. All of the witnesses to the incident, including the juror, the spectator, and an employee of the court who witnessed the contact, either testified or submitted an affidavit. All stated that the juror promptly terminated the conversation upon hearing that the spectator had attended the prior trial. Moreover, none of the witnesses to the incident stated that the juror was informed of the outcome of the prior trial. On questioning by the trial judge, each of the jurors stated under oath that her vote was based solely on the evidence presented at trial and the instructions provided by the court.
 
 
 16
 After the hearing, the defendants filed a motion for a new trial pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. On February 8, 1988, the district judge denied that motion, concluding that "there was absolutely no juror misconduct, that any contact which occurred was harmless, and that all jurors exhibited exemplary behavior at all times." J.App. at 55.
 
 II.
 
 17
 In their first argument, the defendants assert that the district court erred in denying their motion for a directed verdict on the fraudulent misrepresentation claims. They maintain that the disclaimer-of-reliance language in the lease agreement forecloses recovery on these claims because reliance is an essential element of fraud. The defendants also attempt to distinguish between contractual provisions purporting to disclaim liability and those purporting to disclaim reliance, asserting that Tennessee law disfavors only the former. Finally, the defendants contend that our decision in Saylor I does not squarely address the effect of reliance disclaimers under Tennessee law, and that the law-of-the case doctrine therefore is not applicable.
 
 
 18
 The pertinent terms in the lease contract provide as follows:
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 10. The Seller hereunder is an independent contractor none of whose representations are binding on the Manufacturer.
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 14. Preamble--Buyer understands the conditions of the use of the products and is not relying on the skill or judgment of the Manufacturer or Seller in selecting them because Buyer acknowledges that farming and livestock feeding results are very much the product of individual effort combined with various climatic, soil, water, growing and feeding conditions which are beyond the control of the Manufacturer and Seller. Buyer recognizes that any advertisements, brochures, and other written statements which he may have read, including any farm profit plan which may have been shown to him, as well as any oral statement which may have been made to him, concerning the potential of the Harvestore and or Slurrystore units and allied machinery and equipment, are not guarantees and he has not relied upon them as such because the products will be under Buyer's exclusive management and control....
 
 
 25
 * * *
 
 
 26
 * * *
 
 ACKNOWLEDGEMENT AND RELIANCE
 
 27
 I HAVE READ AND UNDERSTOOD THE TERMS AND CONDITIONS OF THIS PURCHASE ORDER INCLUDING THE WARRANTIES. DISCLAIMERS AND TERMS AND CONDITIONS HEREIN GIVEN TO ME, EITHER BY THE MANUFACTURER OR THE SELLER. I RELY ON NO OTHER PROMISES OR CONDITIONS AND REGARD THAT AS REASONABLE BECAUSE THESE ARE FULLY ACCEPTABLE TO ME.
 
 
 28
 J.App. at 824a (emphasis added).
 
 
 29
 The defendants assert that in Saylor I, we did not squarely address the effect of such a reliance disclaimer under Tennessee law. However, the contractual provisions at issue in Saylor I are the identical provisions involved in this case, and the Saylor I court held that "the district court did not err in denying summary judgment and a directed verdict on the basis of the disclaimers of reliance." 803 F.2d at 1407 (emphasis added). Moreover, the same issue was presented to this court in Agristor Leasing v. William Dayon Taylor, 865 F.2d 1267 (6th Cir.1989), wherein the court stated as follows:
 
 
 30
 AOSHPI argues [that] the district court erred in failing to give effect to its "disclaimer of reliance." AOSHPI attempts to distinguish its "disclaimer of reliance" from the "disclaimer of liability" in the Agristor lease in Saylor [I]. We find the claimed distinctions to be ineffective in light of Saylor [I] and Tennessee law, which gives no effect to disclaimers in the presence of fraud or negligent misrepresentations.
 
 
 31
 Slip op. at 10. Contrary to the defendants' assertions, the Saylor I court expressly held that the contractual disclaimer involved in this case was not effective to shield the defendants from liability for fraudulent misrepresentation. Moreover, we have since held in the Taylor decision that the defendants' claimed distinction between liability disclaimers and reliance disclaimers is not effective. Given the decisions in Saylor I and Taylor, we are bound to reject the defendants' arguments concerning this issue.
 
 III.
 
 32
 The defendants next contend that the district court erred in denying their motion for a new trial, which was filed after the judicial inquiry into the circumstances and effect of the outside juror contact. The defendants assert that the juror's contact with the spectator was presumptively prejudicial to them, and that a new trial was required because the plaintiffs did not rebut that presumption of prejudice.
 
 
 33
 The defendants filed their motion for a new trial pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. Rule 60(b) states, in pertinent part, as follows:
 
 
 34
 On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order or proceeding for the following reasons: .... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b).... (6) any other reason justifying relief from the operation of the judgment.
 
 
 35
 The decision whether to grant a Rule 60(b) motion is committed to the sound discretion of the trial court, and the granting or denial of such a motion may not be reversed unless the trial court abuses its discretion. In Re Salem Mortgage Co., 791 F.2d 456, 459 (6th Cir.1986).
 
 
 36
 The defendants rely on Remmer v. United States, 347 U.S. 227 (1954), for the proposition that unauthorized contacts with jurors are presumptively prejudicial, and that the burden is on the party seeking to preserve the judgment to show lack of prejudice. In Remmer, the Supreme Court stated that:
 
 
 37
 In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.
 
 
 38
 347 U.S. at 451. While Remmer was a criminal case, the doctrine of "presumed prejudice" also has been applied in the civil context. See, e.g., Krause v. Rhodes, 570 F.2d 563, 568 (6th Cir.1977), cert. denied, 435 U.S. 924 (1978); Hobson v. Wilson, 737 F.2d 1 (D.C.Cir.1984), cert. denied, 470 U.S. 1084 (1985). Therefore, if Remmer were controlling law, the burden would have been on the Saylors to establish lack of prejudice from the unauthorized contact. However, in United States v. Pennell, 737 F.2d 521 (6th Cir.1984), cert. denied, 469 U.S. 1158 (1985), this court interpreted a more recent Supreme Court decision, Smith v. Phillips, 455 U.S. 209 (1982), as superseding the Remmer rule. Although Phillips did not expressly overrule Remmer, the Phillips Court stated that the "remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove bias." 455 U.S. at 215 (emphasis added). Interpreting this language in Pennell, we stated:
 
 
 39
 Thus, the Court held that Remmer does not govern the question of the burden of proof where potential jury partiality is alleged. Instead, Remmer only controls the question of how the district court should proceed where such allegations are made.... In light of Phillips, the burden of proof rests upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual juror partiality. Prejudice is not to be presumed.
 
 
 40
 737 F.2d at 532 (emphasis added; footnote omitted). Accord United States v. Zelinka, 862 F.2d 92, 95 (6th Cir.1988) (noting that Pennell provides the controlling rule in this Circuit).
 
 
 41
 The defendants in this case argue that Phillips and Pennell apply only to pre-verdict hearings for juror prejudice, and that Remmer continues to govern post-verdict hearings for juror prejudice. While admitting that nothing in Pennell so limits its holding, the defendants assert that applying Pennell to post-verdict hearings would violate Rule 606(b) of the Federal Rules of Evidence. Rule 606(b) provides, in pertinent part, as follows:
 
 
 42
 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.
 
 
 43
 (emphasis added).
 
 
 44
 Given the above-emphasized language, the defendants' interpretation of Pennell must fail. Presumably, under the Remmer rule, the party seeking to preserve the judgment would be allowed to demonstrate the absence of prejudice by questioning the jurors, post-verdict, under the authority of the Rule 606(b) exception. However, the defendants assert that the post-verdict questioning of jurors to establish the existence of prejudice under the Phillips/Pennell rule would violate Rule 606(b). Plainly, if post-verdict questioning of jurors was permissible when the Remmer presumption was applicable, such post-verdict questioning is permissible under Phillips and Pennell. The interpretation and application of Rule 606(b) does not turn upon who has the burden of proof.
 
 
 45
 Because the holding in Pennell applies equally well to pre-verdict and post-verdict hearings for juror prejudice, the defendants in this case bore the burden of proving that the extraneous juror contact resulted in actual prejudice. Since the defendants failed to carry that burden, the district court did not abuse its discretion in denying their motion for a new trial on this ground.
 
 IV.
 
 46
 The defendants' final argument concerns the manner in which the district court submitted the pre-judgment interest issue to the jury. As stated earlier, the district judge made a pre-trial ruling that the parties could not introduce evidence on this issue because the court, not the jury, would determine whether such damages should be awarded and in what amount. The district court reaffirmed that ruling during trial. Nevertheless, at the close of the evidence, the court decided to submit the issue to the jury. The jury subsequently awarded $490,000.00 of pre-judgment interest on compensatory damages of $875,000.00. The jury applied an interest rate of eight per year to the total compensatory damage award from July of 1980, when the Saylors purchased the Harvestore equipment, to June of 1987, the date of the jury's verdict. The pre-judgment interest award thus represents $70,000 per year for seven years.
 
 
 47
 The defendants contend that the pre-judgment interest award is improper because the Saylors did not suffer all of their damages as soon as they leased the Harvestore equipment. They argue that the Saylors suffered gradual losses from 1980 until 1985, when they slaughtered the herd and closed down the farm. The defendants further assert that the jury's error in this regard requires a new trial, rather than a remittitur, because the absence of any record evidence on this issue precludes a mathematical computation of the proper amount of pre-judgment interest. Moreover, the defendants assert that the district court's refusal to submit special interrogatories to the jury forecloses a remittitur because the jury's verdict does not indicate what portion of the compensatory damage award is for property losses (arising from the strict liability claims) and what portion is for economic losses (arising from the fraud claims). In the defendants' view, this fact precludes this court from determining when the various losses were suffered, thereby preventing an accurate determination of the proper amount of pre-judgment interest.
 
 
 48
 Tennessee Code Annotated Sec. 47-14-123 (1980) states:
 
 
 49
 Pre-judgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the states as of April 1, 1979 may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum....
 
 
 50
 (emphasis added). Under this provision, courts and juries possess wide discretion in the awarding of pre-judgment interest, and their award should not be disturbed "unless the record discloses a manifest and palpable abuse of discretion.' " Schoen v. J.C. Bradford & Co., 667 S.W.2d 97, 101 (Tenn.App.1964)) (quoting Engert v. Peerless Insurance Co., 382 S.W.2d 541, 550 (Tenn.App.1964)). This court has held recently that "[w]here a jury grants a particular damage award and the district court refuses to disturb that finding, an appellate court should be certain indeed that the award is contrary to all reason before it orders a remittitur or a new trial." In Re Lewis, 845 F.2d 624, 635 (6th Cir.1988).
 
 
 51
 Despite this deferential standard of review, we conclude that the jury abused its discretion in calculating the pre-judgment interest award. Under Tennessee law, "[p]rejudgment interest on a property damage award accrues from the date that the defendant's tortious conduct effectively operates to destroy or diminish either the resale value, the rental value, or even the personal use and enjoyment of the plaintiff's property." Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1213 (6th Cir.1988) (citing cases). Likewise, pre-judgment interest on economic damages (e.g., lost profits) is "calculated from some specific date or dates as found by the court that precede the date of the judgment, and is computed from that date or dates down to the date of the judgment at the prejudgment rate...." American Buildings Co. v. DBH Attachments, Inc. 676 S.W.2d 558, 566 (Tenn.App.1984) (emphasis added). In the instant case, the jury awarded pre-judgment interest on the Saylors' total compensatory damage award of $875,000.00 from the time that they leased the Harvestore equipment in July 1980, to the date of the jury verdict in June 1987. This award constitutes a "manifest and palpable abuse of discretion" since it is clear from the record that the Saylors did not incur all of their damages in 1980, but instead suffered gradual losses from 1980 until 1985. Therefore, the jury clearly erred in its calculation of pre-judgment interest.
 
 
 52
 The defendants argue that the jury's error requires a new trial because, as they assert, there is no principled manner in which to calculate a remittitur on the present state of the record. We disagree. Although the general verdict in this case does not allow for a precise calculation on our part of the proper amount of pre-judgment interest, the record permits us to fashion a minimum award. Since it is clear from the record that the Saylors incurred all of their damages (both property losses and economic losses) by July 1985, we believe that the Saylors are entitled to at least two of the seven years of pre-judgment interest which the jury awarded. Therefore, applying the jury's chosen interest rate of eight percent per year to the compensatory damage award of $875,000.00, we conclude that a pre-judgment interest award of $140,000.00 is permissible on the record presented. Accordingly, we believe that a remittitur of $350,000.00 of the jury's pre-judgment interest award is required.
 
 V.
 
 53
 For the reasons set forth above, the order of the district court denying the defendants' motion for a new trial is REVERSED to the extent that it failed to direct a remittitur of a portion of the pre-judgment interest award. Accordingly, we REMAND this case to the district court with instructions to grant a new trial limited to the damages issue, unless the plaintiffs file in the district court, within thirty days of the filing of this opinion, a motion requesting a remittitur of $350,000.00 of the pre-judgment interest award.