**AMERICAN BUILDINGS COMPANY, Plaintiff and Counter-Defendant/Appellant,**

v.

**DBH ATTACHMENTS, INC., Defendant and Counter-Plaintiff/Appellee.**

Court of Appeals of Tennessee, Western Section, at Jackson.

March 16, 1984.

Rehearing Denied April 9, 1984.

Application for Permission to Appeal Denied by Supreme Court Aug. 27, 1984.

Louis F. Allen and Louis J. Miller of Waring & Cox, Memphis, for plaintiff and counter-defendant/appellant.

W.J. Reynolds and Robert V. Redding of Reynolds, Deusner & Redding, Selmer, for defendant and counter-plaintiff/appellee.

TOMLIN, Justice.

This is the second time this case has been before us. The issues now presented pertain only to the question of damages, and more particularly concern themselves with the proof of lost profits due DBH Attachments, Inc., arising from a delay in its occupancy of a new manufacturing plant caused by the improper installation of a negligently designed roof structure which

was manufactured by American Buildings Company.

For a detailed statement of the facts, as well as the prior holding of this Court, we refer the reader to the case of *American Buildings Co. v. White*, 640 S.W.2d 569 (Tenn.Ct.App.) *cert. denied* (1982). By this appeal, American Buildings Company (ABC), challenges each item of damages awarded by the chancellor below on remand as lost profits of DBH Attachments, Inc. (DBH). For the reasons stated hereinafter, we affirm in part, modify in part, and reverse in part the findings and decree of the chancellor.

The facts material to this appeal are as follows: DBH entered into a contract with White Construction Company, Inc. for the erection by White of a metal roof on a new concrete block building that was under construction by DBH. ABC, a specialist in prefabricated metal buildings, sold the roof structure to White, who made the installation. DBH refused to pay White, contending that the roof was unsatisfactory. Therefore, White did not pay ABC. After ABC filed suit in the Chancery Court of McNairy County against White for the balance remaining on the roof and against DBH to enforce a lien, DBH counterclaimed against ABC and cross-claimed against White. White is now in bankruptcy, so we will ignore it and its involvement in this controversy.

DBH's suit against ABC was based on five theories: (1) negligent design; (2) breach of express and implied warranty; (3) strict liability; (4) negligent or willful misrepresentations; and (5) violation of the Tennessee Consumer Protection Act. At the initial hearing, the chancellor found in favor of DBH on all grounds, except the Consumer Protection Act.

In our previous opinion we found, as did the chancellor, that the evidence established that the roof as erected on DBH's building was unstable, and that this instability was due to both a poor erection job and an improperly designed roof system. We also held that DBH had proven a case of tortious misrepresentation. We did not pass specifically upon the other theories of liability on the part of DBH, except to affirm the chancellor as to his holding regarding the Tennessee Consumer Protection Act. The chancellor rendered judgment against ABC and in favor of DBH for the following sums:

| | |
|---|---|
| Cost of replacement and repair of roof | $ 43,005.63 |
| Lost profits from prototype machine not produced | 6,000.00 |
| Loss of rental income | 3,480.00 |
| Lost profits | 180,927.04 |
| TOTAL | 233,412.67 |

As to these findings regarding damages, in our first opinion we said:

ABC has objected on appeal to each element of the damages. As to the award of $43,005.63 for property damage and repair of the roof itself, we find that the proper measure of damages was applied and the evidence does not preponderate against that amount. However, we do not find that the proof establishes the remaining sums as reasonable calculations of lost profits.

The Chancellor awarded DBH $180,927.04 in lost profits using the following calculation:

| | |
|---|---|
| (a) Net profits for the first year after occupancy ... | $351,856.52 |
| (b) Monthly net profit (a) ÷ 12 ............... | 29,321.38 |
| (c) Monthly net profit for 4 months immediately preceding occupancy ....... | 6,705.50 |
| (d) Difference between (b) and (c) ................. | 22,615.88 |
| (e) Net profit loss, (d) x 8 months (delay in occupancy attributed to appellants) .................. | 180,927.04 |

We find that this calculation of lost profits is too indefinite and speculative to represent proven actual damages to DBH.

. . . .

DBH is entitled to recover lost profits that are the result of proven actual lost revenues and proven higher costs resulting from the inability to occupy their new facility. Because an improper method

was used to calculate lost profits from the evidence presented, the case will be remanded for determination of the actual profit losses appearing in the record. *American Buildings, Co.*, 640 S.W.2d at 574–75.

On remand, both ABC and DBH submitted detailed memoranda setting forth their respective concepts of lost profits under the criteria as set out by this Court in its initial opinion. Four days after hearing argument of counsel, the chancellor filed a memorandum opinion in which he found that DBH was entitled to lost profits in the amount of $188,635.34.

The chancellor arrived at the total amount of lost profits as follows:

| | |
|---|---|
| Prototype machine not produced | $16,000.00 |
| Lost rental income from building | 3,480.00 |
| Lost orders (2 firm; 16 tentative) | 30,607.92 |
| Engineering fees for inspection and repairs of roof | 2,815.78 |
| Lost profits attributable to higher labor costs | 60,253.86 |
| Lost profits attributable to higher material costs | 75,477.78 |
| TOTAL | 188,635.34 |

In the previous opinion of this Court, Judge Nearn wrote:

> We are aware of the general rule that in a *de novo* review we should render the judgment as we think should have been rendered in the Trial Court. *See Newberry v. Newberry*, (1972 Tenn.App.W.S.) 493 S.W.2d 99. However, this record consists of 15 volumes of testimony alone. There are also exhibits consisting of tomes of invoices, etc. In addition, plaintiff attempted to prove damages under at least three different theories, systems, or measures hoping the Court would pick the most advantageous for the plaintiff. Proof of damages under any of the alleged measures is scattered throughout the record. We have neither the facilities nor the inclination to sift through the record to determine a dollar amount for damages. Hence, we must remand to the Chancery Court for that

purpose, where the Chancellor, if he is so inclined, may refer the matter to a master for that determination.

*Id.* at 576.

In the opinion of this Court, if there ever was a picture book case for reference to a master, this is it. Insofar as the use of a master by the chancellor is concerned, we can only suggest, not direct. Judge Nearn made as strong a suggestion as could be made. However, the chancellor elected to wrestle with this statistical octopus in his own court. That is his privilege. However, at this juncture, the second time around, we are going to follow the rule laid down in *Newberry* and proceed to render such a judgment as we think the chancellor should have rendered. If we are incorrect, then we leave it to our brothers on the Supreme Court to correct our errors.

Before reviewing the various categories comprising the judgment for lost profits, we acknowledge the principles of law by which we proceed. We fully realize that since this is a nonjury case, we are obliged to review the record *de novo* on appeal, acknowledging that the findings of the chancellor below come to us with a presumption of correctness which we must affirm, absent an error of law, unless we find that the evidence preponderates against a particular finding. Rule 13(d), Tennessee Rules of Appellate Procedure. It is also the rule in this state, as it is in most other states, that lost or expected profits are recoverable as damages in a case such as this, provided that they can be provided with reasonable certainty and are not in fact remote or speculative. *Morristown Lincoln-Mercury v. Roy N. Lotspeich Publishing Co.*, 42 Tenn.App. 92, 298 S.W.2d 788 *cert. denied* (1956).

## I. ENGINEERING FEES.

The award of $2,815.78 by the chancellor as engineering fees to compensate the engineers employed by DBH for advice and inspection in the reconstruction of the roof is erroneous for at least two reasons. First of all, it is outside the scope of the

remand, which was limited to a determination of lost profits, if any, by DBH in being delayed some eight months in occupying their new building. Furthermore, in the original trial of this case, the chancellor gave judgment for DBH against ABC as the net cost to them of the repair and replacement of the roof the sum of $43,005.63. This was affirmed on appeal, and that judgment became final when application for permission to appeal was denied by our Supreme Court. The doctrine of *res judicata* precludes the trial court from reopening this issue. This segment of the chancellor's decree is reversed.

## II. LOST ORDERS FOR MACHINES.

Dean Hunt, the president of DBH, testified that his company "lost" only 18 orders for machines during this troubled period. More specifically, he testified that two "firm" orders were lost and 16 "tentative" orders were lost. The chancellor below treated all 18 orders as being lost on account of the misfeasance or malfeasance of ABC. The award of $30,607.92 for these machines was obtained in the following manner, as suggested in DBH's memo to the chancellor: DBH, by computation, asserted that in the one-year period following the occupancy of the new manufacturing plant it had an average profit of $1,744.00 on each machine it built. This amount, multiplied by the 18 machines, produced the above figure.

■ The first problem with this conclusion is that there is nothing in the record to show whether one or all 16 of the "tentative" orders were lost due to the fault of ABC, or whether one or all 16 of the tentative buyers otherwise decided to forego the purchase of these machines. We thus find that lost revenues attributed to these 16 machines do not constitute "proven actual lost revenue," as required by our initial opinion.

■ Secondly, we find fault with the calculations of DBH which were followed by the chancellor. In its memorandum submitted on remand, DBH obtained the average profit-per-machine figure of $1,744.00 by dividing the total number of machines produced the year following occupation of the new facility—210—into the gross profit for that period of $357,092.52. In Tennessee, the recovery of lost profits must be based on net profits and not on gross profits. *See Joy Floral Co. v. South Central Bell Telephone Co.*, 563 S.W.2d 190 (Tenn.Ct.App.1977). The same financial statement of DBH that reflected a gross profit of $357.092.52 showed a net profit for the same period of $218,241.44. This amount divided by the one-year production of 210 projects an average profit for machine of $1,039.25.

■ Nevertheless, having obtained a net profit figure, it cannot be determined from the record whether or not this is a viable yardstick for measuring the amount of damages resulting from the loss of sale of the two firm orders. This uncertainty is due to the fact that of the 210 machines produced in that first year in the new building, 179 were of the same type as the two firm orders lost by plaintiff and 31, or 15 percent of the total, were of a different kind and type. Hunt of DBH testified that some of the machines DBH made had a low-profit margin, while others had a higher profit margin. We can find nothing in the record to reflect what the average profit on this particular machine is. The proof as to the two lost firm orders, in our opinion, fails to meet the standard established by *Morristown Lincoln-Mercury, supra.* For these reasons, this segment of the chancellor's award is also reversed.

## III. THE PROTOTYPE MACHINE.

■ The chancellor below not only reinstated his previous $6,000 awarded as lost profits for a prototype machine never produced by DBH, but also tacked on an additional award of $10,000, to which Dean Hunt of DBH testified that the purchaser of the machine was to pay him as a consulting fee after the machine "had proven acceptable after field testing." The chancellor was in error in making an award of $16,000 as lost profits for this prototype

machine for two reasons: First of all, it is uncontradicted that Hunt signed the contract with the prospective purchaser on December 7, 1977, which called for the delivery of the machine by January 1, 1978, or only 23 days before the delivery date. The record reflects that at the time this contract was signed, Hunt knew that DBH would not be occupying its new facility for some weeks to come. It was also known that DBH was unable to build the machine in its own facilities, which is the basis for its claim for damages. In other words, Hunt knowingly placed DBH in a position of nonperformance at the time he signed the contract for this prototype. Furthermore, as to the $10,000, it was only payable after the machine had been field-tested and proven acceptable. This contingency never did occur. Accordingly, this segment of the chancellor's award is reversed.

### IV. LOST RENTAL INCOME.

On remand, as part of lost revenues, or lost profits, the chancellor reinstated his previous award of $3,480, representing rental income which DBH claimed it would have received from a sister company, as lost rental for the eight-month period, for the space in the old building to be given up by DBH Attachments.

■ Hunt testified at trial that DBH Attachments had an oral lease with DBH Distributors, a sister company of which he owned 49 percent of the stock. There was no testimony as to the terms of the lease insofar as who was responsible for maintenance and upkeep, taxes, insurance, and utilities. However, Hunt did testify that this rental figure was arrived at by subtracting so much of the insurance and utilities that were attributable to that portion of the building to be taken over by DBH Distributors. Here again is an example of gross figures not being reduced to "net" figures. Although some of the usual expenses incurred in landlord-tenant relationships have been dealt with, i.e., insurance and utilities, the record is silent as to the responsibility of taxes and maintenance, both of which would have an effect on the net figure. Because of the uncertainty of the record as to this item, the award of rental income in the amount of $3,480 is also reversed.

■ In its brief, DBH contends that it should be allowed to recover for the rental value of the entire facility for that portion of time during which it was not able to be occupied. Since recovery for lost profits compensates DBH for its inability to occupy the facility, we find this contention to be without merit.

### V. LOST PROFITS ATTRIBUTABLE TO INCREASED LABOR COSTS.

On remand, in its memorandum to the chancellor, the plaintiff sought to prove lost profits by proving increased manufacturing costs in both labor and materials resulting from the eight-month delay in occupying the new plant. Based upon the proof in the record, DBH's contentions were something like this: For the one-year period immediately preceding the occupancy of the new plant, DBH produced 126 machines in the old plant requiring an average of 103.15 man-hours for the production of each. In addition, DBH presented evidence showing that 19.5 hours of labor were subcontracted out to others in connection with the production of each machine, for a total of 122.65 man-hours required to produce each machine.

By the same token, DBH presented evidence to show that in the first year after occupancy of the new plant, 193 such machines were produced, requiring only an average of 67.44 man-hours for the production of each unit. DBH then subtracted the average man-hours per machine produced in the new plant from the average number of hours required to produce a machine in the old plant to yield a difference of 55.21 hours per machine.

The chancellor arrived at his $60,253.86 award of lost profits attributable to increased labor costs by multiplying what we have labeled the production differential of 55.21 hours by the total of 126 machines which were produced during the one-year

period prior to occupancy of the new building. This multiplication showed an additional 6,957.72 hours of labor required by DBH to produce the 126 machines in the old building that would not have been required in the new building. This figure was then multiplied by $8.66, the average cost of hourly labor as testified to by DBH's accountant, as the labor rate.

The above calculations are erroneous in several respects. First of all, the chancellor apparently simply accepted the graphic representation in a trial exhibit of DBH to the effect that 19.5 hours of labor were contracted outside the premises on each machine. These 19.5 hours of outside labor were computed at the rate of $8.66 per hour, the average hourly rate in DBH's plant. However, Duane Brown, DBH's CPA, testified that current studies showed that only 15 hours per machine were subcontracted out, and that the average hourly wage rate of the employee who did this subcontract work was $5.50. Secondly, the plaintiff sought to recover—and the chancellor allowed—additional labor costs for a full one-year period prior to the occupancy of the new building, rather than eight months, the amount of delay previously found by the chancellor to be attributable to ABC. This was done by multiplying the hourly production differential by 126 machines, which was the total produced in an entire year.

DBH's proof showed that only 86 machines were produced in the eight-month period immediately preceding its occupying the new building. Therefore, it is necessary for this Court to determine the production hour differential per machine between the old plant and the new plant, which should be reached by multiplying the hour differential by 86, rather than by 126. This we have done. Without concerning ourselves with the subcontract labor at this time, DBH's proof showed that 103.15 hours were required to produce an indexer in the old plant, while only 67.44 hours were required in the new plant. Subtracting the smaller number from the larger number reflects a production hour differential of 35.71 hours per machine. Multiplying this figure by 86—the number of machines produced in eight months—totals 3,071, which represents the additional man-hours required to produce 86 machines. This figure multiplied by the hourly wage rate of $8.66 equals $26,594.86. To this total must be added the cost of subcontract labor incurred by DBH during this eight-month period. This is obtained very simply by multiplying the 15 hours of subcontract labor per machine as testified to by Brown, by the 86 machines produced, times the wage rate for the subcontract work of $5.50 per hour, which equals $7,095.00. This amount added to the $26,594.86 previously obtained equals $33,689.86. The chancellor's award for lost profits attributable to increased labor costs of $60,253.86 is hereby reduced to the sum of $33,689.86.

## VI. LOST PROFITS DUE TO INCREASED COST OF MATERIALS.

It is DBH's theory and contention that after moving into the new building and increasing production as well as storage space, it was able to purchase raw materials in such quantities so as to obtain greater discounts than before, thus reducing its production costs. DBH thus contends that its profits were suppressed by such increased material costs brought about by the eight-month delay attributable to ABC.

It would appear that proof of such increased material costs would be quite simple and readily ascertainable. Basically all that would be required would be to total all invoices for raw materials paid by DBH during both the one year immediately prior to occupying the new building and the first year after occupancy or, in the alternative, totaling the checks written by DBH to pay these invoices. After subtracting the smaller from the greater, if DBH's contentions were correct, the difference would be attributable to the one-year period prior to occupying the new building. Then it would be a simple matter of running through the same type of procedures as with the labor costs in determining the additional material cost per machine and multiplying this amount by 86. Unfortunately, such a clear cut procedure was not followed, whether it was available or not. As a matter of fact, no such evidence was offered, except three

sample invoices to show that after occupying the new building, DBH was paying a few cents per part less than they were paying prior to occupying the new building.

Instead of proving its additional materials cost in this fashion, DBH chose to present figures from its financial statements which admittedly contained the cost of labor embodied in the beginning and ending inventories for each one-year period. Not only were labor costs involved in the computation, but DBH itself assumed a constant raw materials cost for each product of 21 percent in the year-end work in process both before and after moving into the new building. If this assumption on its part is correct, this Court is led to believe that the actual raw materials costs were no higher in the old building than in the new. If this assumption is false, then this Court is led to believe that the calculations from the financial statements based upon this figure are faulty. We do not believe that the proof as submitted to the chancellor by DBH rises to the dignity of the standards heretofore laid down that we have referred to in the case of *Morristown Lincoln-Mercury, supra.* In our opinion, the proof on this issue is fraught with both uncertainty and speculation. Accordingly, the decree of the chancellor awarding $75,477.78 for lost profits due to increased materials cost is reversed.

### VII. INTEREST.

The judgment entered by the chancellor following remand stated:

The judgment against American Buildings Company—shall draw interest at the highest prejudgment or post-judgment interest rate prescribed by statute from and after November 30, 1980, up to and including the date of entry of this final decree.

In the original judgment entered by the chancellor from which the initial appeal to this Court was taken, no award was made by him for pre-judgment interest. DBH, in its cross-appeal, did not cite as error on the part of the chancellor his failure to do so.

The question of pre-judgment interest was first presented to the trial court in this case in DBH's memorandum on remand, which concerned itself solely with the ascertainment of damages in the form of lost profits.

We are of the opinion that pre-judgment interest should not be awarded in this case. First of all, on the initial appeal, had this Court affirmed all elements of damages awarded by the chancellor, that would have settled the litigation and in no way could DBH have claimed the right to pre-judgment interest.

In our former opinion, this Court did affirm the chancellor's decree as to the roof repairs, yet it is not contended by DBH that they are entitled to pre-judgment interest now on that item. The scope of the remand by this Court was solely for the determination of lost profits.

We do not think that the decree as framed by the chancellor actually provided for pre-judgment interest. In essence, what his decree stated was that DBH should receive interest on all damages awarded from and after November 30, 1980, at the highest rate prescribed by statute, whether the highest rate was the pre-judgment rate or the post-judgment rate. Furthermore, as we conceive pre-judgment interest, it is to be calculated from some specific date or dates as found by the court that preceed the date of the judgment, and is computed from that date or dates down to the date of the judgment at the pre-judgment rate, with interest computed after that date at the post-judgment rate. No such pre-judgment date to signal the beginning of pre-judgment interest was found to exist by the chancellor.

As for post-judgment interest, we are of the opinion that DBH is entitled to post-judgment interest at the prevailing statutory rate on the amounts awarded to it as damages. At the initial trial the chancellor held that ABC was liable to DBH for lost profits. That liability was affirmed by this Court. The purpose of the remand was solely to have the chancellor properly determine what those damages amounted to. Had the amount been correctly determined in the first instance, resulting in

affirmance by this Court on the initial appeal, there is no question but that post-judgment interest would follow that award from the date of the chancellor's opinion. It stands to reason that DBH should have post-judgment interest on whatever the amount of its judgment is, to run from the date that liability affixed.

For the reasons stated above, judgment shall be entered for DBH against ABC on its counterclaim in the amount of $76,-695.49, representing $43,005.63 as the amount previously awarded to DBH for the cost of repair and replacement of the roof, and an amount of $33,689.86 representing lost profits to DBH as found by this Court. Said judgment is to draw post-judgment interest at the prevailing statutory rate from and after November 29, 1980. Costs in this cause are taxed one-half to ABC and one-half to DBH, for which execution may issue, if necessary.

NEARN, P.J. (W.S.), and HIGHERS, J., concur.