1 F.3d 1241
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
PACIFIC EASTERN CORPORATION, Plaintiff-Appellant Cross-Appellee,
v.
ITT CORPORATION; Sheraton Corporation, Defendants-Appellees
Cross-Appellants.
 Nos 92-5804, 92-5805.
 United States Court of Appeals, Sixth Circuit.
 July 13, 1993.
 
 Before GUY and BATCHELDER, Circuit Judges; and EDMUNDS, District Judge*
 PER CURIAM.
 
 
 1
 Plaintiff appeals the district court's decision in this diversity breach of contract action. Plaintiff argues that the district court incorrectly calculated damages, failed to award damages for certain expenses plaintiff incurred, and improperly awarded damages on defendants' counterclaim. ITT Corporation and Sheraton Corporation, hereinafter referred to as defendant, have cross-appealed the award to plaintiff. After reviewing the evidence presented and the arguments of the parties, we affirm the district court's rulings, with the exception of the amount of damages to be awarded to the plaintiff.
 
 I.
 
 2
 Plaintiff, Pacific Eastern Corporation, was formed in the early 1970s by Charles Whittemore and Rod Laver for the purpose of developing the Sheraton South Inn in Nashville, Tennessee. Pacific Eastern hired award winning architect Ebbe Vedrickson to design and build the hotel. Once completed, the Sheraton South received the AIA outstanding design award for all hotels under 500 rooms in the United States in 1974. In 1973, Pacific Eastern entered into a ten-year license agreement with Sheraton Corporation. The agreement provided for periodic inspections to be performed by Sheraton representatives. Under the agreement, a failing grade on an inspection constituted a default that would subject the agreement to termination if not cured within 30 days. The parties also executed a reservation system agreement that provided for Sheraton South's participation in the Sheraton reservation system, allowing the Sheraton South to receive reservations through the national 800 number.
 
 
 3
 In the beginning the relationship went well. However, in 1979 and 1981, the Sheraton South received marginal grades on its inspections. Charles Whittemore complained to Sheraton's management about the results of these inspections. As the ten-year term came to a close, Sheraton insisted that certain renovations be completed at the Sheraton South before any renewal of the license agreement would occur. After the renovations were completed, the parties signed a second ten-year license agreement on March 1, 1984, with similar provisions concerning the reservation system and inspections. Additionally, this new license agreement allowed either party, after five years, to terminate the agreement by providing a six-month written notice.
 
 
 4
 In 1984 and 1985, the Sheraton South received marginal and average grades on its inspections. Again Whittemore complained to management. In March 1987, the Sheraton South received a failing grade in four areas. These deficiencies had not been corrected by the time of the follow-up inspection in April. Instead of terminating the agreement, Sheraton worked with Pacific Eastern on improving the Sheraton South so that it could pass its inspections. A marginal grade was received at the June 1987 inspection and an average grade was reported for the August 1987 inspection. The Sheraton South was told that its inspection results would need to continue to improve. Working with Sheraton representatives, Pacific Eastern then undertook additional renovation projects. However, at the June 1988 inspection, the Sheraton South again received a failing grade. Whittemore protested the grade, but was informed that if the problems were not cured by the follow-up inspection, set for August 29, the license agreement would be terminated. Following the August inspection, Whittemore was informed that the license agreement would terminate effective November 30, 1988.
 
 
 5
 Three days prior to the August inspection, Sheraton's general counsel sent a letter to Pacific Eastern, which stated that Sheraton would be terminating the license agreement, effective March 1, 1989, pursuant to the termination provision contained in the March 1984 agreement.
 
 
 6
 On November 28, 1988, plaintiff filed the present action seeking injunctive relief and damages. Plaintiff also sought a temporary restraining order preventing Sheraton Corporation from terminating or suspending any business relationship with Pacific Eastern. The district court granted the requested restraining order that day. On January 4, 1989, the restraining order was dissolved and an agreed order was entered, which provided that the parties' license agreement would remain in effect until March 1, 1989, the day either party could terminate the agreement pursuant to the agreement's own terms.
 
 
 7
 Plaintiff's complaint alleged that Sheraton Corporation had breached its duty of good faith and fair dealing in several different ways and had caused Pacific Eastern to undertake unnecessary and costly renovations. In addition to alleging that Sheraton inappropriately sought to manufacture grounds for termination by conducting harsh and erroneous inspections, Pacific Eastern alleged that Sheraton had steered business away from the Sheraton South to the corporate managed "Music City Sheraton" that opened in 1985. Pacific Eastern claimed that Sheraton manipulated the priority of listings in the computer used for the 800 number reservations and manipulated the advertisements in the Nashville Yellow Pages. Sheraton Corporation counterclaimed for unpaid fees under the license and reservation agreements.
 
 
 8
 At trial, plaintiff presented evidence of Sheraton's motive for directing business away from the Sheraton South to the Music City Sheraton. Under the agreement with the Music City Sheraton, Sheraton Corporation agreed to loan up to $1.7 million to the owners of the Music City Sheraton for working capital, pre-opening expenses, and operating shortfalls. Additionally, the owners of the Music City Sheraton had a right of termination if their adjusted gross operating profit was not a "positive number" for each of two consecutive fiscal years. Sheraton Corporation could cure this defect and prevent termination by paying to the Music City Sheraton enough to raise the "negative" adjusted gross operating profit to zero. The fees received from the Sheraton South were significantly smaller than the fees received from the Music City Sheraton.[1]
 
 
 9
 After a six-day bench trial, the district court ruled that Sheraton had not acted in bad faith concerning the 1987 renovations, but that Sheraton had violated its duty of good faith and fair dealing in manipulating the reservation system. Plaintiff sought to recover in damages its total lost profits due to the decline in its overall occupancy rates after 1984. The court declined to follow this formula, noting that to do so would compensate plaintiff for general fluctuations in occupancy that could be due to any number of factors not related to defendant's actions. Instead, the court awarded an amount to compensate only for the decline in those reservations received from the 800 number after 1984. The court calculated the amount owed by dividing the number of rooms reserved through the 800 number by the total number of rooms available at the Sheraton South for each year. Using 1984 as a base year, the court awarded plaintiff $207,697 as lost profits attributable to Sheraton's bad faith actions. The court additionally found that, while Sheraton's manipulation of the telephone directories was a breach of the duty of good faith and fair dealing, plaintiff had failed to prove that this action caused them any loss in profits.
 
 
 10
 Turning to defendant's counterclaim, the court found that plaintiff had failed to pay certain fees totaling $19,387.96. Plaintiff contested $10,946.95 of that amount, but the district court ruled that "plaintiff did not show sufficient probative evidence to support its defenses that Sheraton failed to provide services or functional equipment." (App. 96.)
 
 
 11
 After this decision, defendant filed a motion for reconsideration pursuant to Federal Rule of Civil Procedure 52(b). In ruling on this motion, the district court determined that its method of calculating damages had done what it had strived to avoid--award damages for loss in revenue attributable to the general economic downturn in the local hotel business. Instead of using the total rooms available as the denominator in the damage equation, the district court agreed with defendant that the total rooms occupied was the appropriate denominator. The district court concluded that, by using the rooms occupied, the calculation "would properly eliminate the overall downward turn in business from the calculus of damages...." (App. 98-99). Using the revised formula, plaintiff was awarded $108,866.55.
 
 II.
 
 12
 We review the findings of fact made by the district court under the clearly erroneous standard. Anderson v. Bessemer City, 470 U.S. 564, 573 (1985). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). Conclusions of law are subject to de novo review by this court. Taylor and Gaskin, Inc. v. Chris-Craft Indus., 732 F.2d 1273, 1277 (6th Cir.1984).
 
 
 13
 Plaintiff makes three main arguments on appeal. First, it argues that the district court's finding that defendant did not violate its duty of good faith and fair dealing concerning the 1987 renovations was clearly erroneous. Second, plaintiff argues that the district court improperly calculated damages in its initial award and then further distorted the damages due in ruling on defendant's motion to reconsider. Third, plaintiff argues that defendant was not entitled to damages on its counterclaim and, if it was, the amount due was significantly less. In its cross-appeal, defendant argues the district court's finding that defendant breached its duty of good faith and fair dealing regarding the reservation system was clearly erroneous.
 
 
 14
 In its brief, Pacific Eastern emphasizes the "aggressive defranchising" policy adopted by Sheraton in the mid-1980s, the "sham" inspections completed by Sheraton officials, and the motive for Sheraton to eliminate the Sheraton South from the Nashville market. Inasmuch as these arguments relate to plaintiff's original claim of improper termination of the franchise agreement, they are irrelevant. Either party had the absolute right to terminate the agreement at any time on or after March 1, 1989. After commencement of this action, Sheraton Corporation agreed to continue the franchise agreement until March 1, 1989. Therefore, no claim for improper termination of the agreement can be maintained. While the district court found that Sheraton "was not honest enough with Pacific Eastern about its defranchising strategy," and acted in "far less than good faith" in conducting the 1988 inspections, it did not award damages for either of those actions. (App. 91-92). Because the agreement was not terminated until March 1, 1989, and Pacific Eastern does not dispute that Sheraton had a right under the agreement to terminate as of that date, Pacific Eastern is not entitled to termination damages even if Sheraton's actions or motives were improper.
 
 A. Renovations
 
 15
 Plaintiff argues that it should have been awarded restitution for Sheraton's alleged bad faith inducement to make the renovations that began in 1987. Pacific Eastern undertook certain renovations after the Sheraton South failed the March 1987 inspection and the defects were not cured by the time of the April 1987 inspection. The renovations included updating a 15-year-old lobby and replacing orange rotary dial telephones with ivory touch tone telephones. The district court found that "Sheraton was acting in good faith in 1987 when it refrained from terminating the license agreement, urged renovations, and sent management to Nashville to assist Sheraton South in improving its operations." (App. 95). The district court further noted that, even if Sheraton had acted in bad faith, there was no proof of damages because Pacific Eastern "is presently benefiting from those renovations in operating the hotel as the Ramada Inn South." (Id. at n. 3).
 
 
 16
 While it is true that Pacific Eastern was required to undertake these renovations in order to maintain the franchise agreement, Sheraton simply could have terminated the agreement for the failing grades on the inspections. Instead, Sheraton cooperated with Pacific Eastern to upgrade certain aspects of the Sheraton South, thereby allowing it to continue as a Sheraton franchise. Plaintiff argues on appeal that Sheraton cooperated "to maintain the illusion of cooperation ... in order to disguise its true secret corporate purpose of 'aggressively defranchising' numerous properties." (Pl's. Brief at 44). We find this theory unsupported. Under the franchise agreement, either party could have terminated the agreement after March 1, 1989. There would have been no reason for Sheraton to go through the trouble and expense of assisting Pacific Eastern in updating the Sheraton South so as to maintain an illusion of cooperation so that it would have a defense when it later terminated the agreement. Sheraton needed only to wait an additional three months to terminate the agreement for any reason or no reason at all.[2] We find the district court's ruling in this regard was not clearly erroneous.
 
 B. The Yellow Pages Advertising
 
 17
 The district court found that Sheraton manipulated the yellow pages directory listings in favor of the Music City Sheraton. Whittemore testified that Sheraton Corporation told him that the Sheraton South would be listed under "Sheraton Hotels, Inns, & Resorts" in the 1988 directory. The Sheraton South did not appear in this listing, but its advertisement appeared on the same page. (App. 619). The district court held that, while this action was a breach of the duty of good faith and fair dealing, plaintiff had failed to carry its burden of proving the manipulation caused any lost profits. Plaintiff bears the burden of proof of damages, and without such proof, there can be no award of damages. Inman v. Union Planters Nat'l Bank, 634 S.W.2d 270, 272 (Tenn.Ct.App.1982). Lost profits are recoverable so long as they are not remote and speculative in nature. American Builders Co. v. DBH Attachments, Inc., 676 S.W.2d 558, 562 (Tenn.Ct.App.1984). On appeal, plaintiff has failed to indicate any evidence in the record to support an award of damages for the manner in which the various Nashville area Sheratons were listed in the yellow pages.
 
 
 18
 Defendant argues that it did not breach any duty concerning the yellow pages. Sheraton presented evidence that it employs the services of an outside advertising company to administer its "trademark advertising." This agency solicits advertisements from the various Sheraton hotels and then places these advertisements with the various yellow page directories across the country, with each individual hotel deciding whether they wish to pay to be included in the trademark advertising. We need not decide whether the district court was correct in ruling that Sheraton acted in bad faith because we agree that plaintiff failed to prove damages.
 
 C. The Reservation System
 
 19
 Defendant presented evidence that on November 22, 1988, the 800 number reservation system was notified to remove the Sheraton South from the reservation system effective November 30, 1988, the date set for termination of the parties' agreement. On November 29, 1988, after plaintiff instituted this lawsuit, Sheraton directed that the Sheraton South remain in the system until further notice.
 
 
 20
 Plaintiff produced evidence that Sheraton Corporation entered a "stop sale" on the Sheraton South into its computer in late 1988. The computer listed April through November 1989 as "stop sales." A "stop sale" means that reservation agents on the 800 number will not book rooms for those nights for that hotel. It is possible for each hotel to place a stop sale from their own computers when their rooms become full, or when they predict filling their rooms. Barbara Whittemore testified that the Sheraton South did not place the "stop sale" in question. Defendant's testimony on this point was that a "stop sale" can be entered as a "close out" on a property whose franchise has been terminated so that the reservation operators will not book reservations for a property which is no longer affiliated with Sheraton Corporation and that this practice did not violate the reservation agreement.
 
 
 21
 The district court did not find that either of these actions were a breach of the duty of good faith and fair dealing such as to give rise to damages. The court did find, however, that Sheraton had acted in bad faith in manipulating the listings in the reservation system in favor of the Music City Sheraton between 1985 and 1988. The Sheraton reservation system lists hotels by city. If a caller does not identify a particular hotel, attraction, or area of the city, the reservation agent will instruct the computer to list the properties in an order that begins with the property closest to the geographical center of the city. The same listing would be used if the caller requested a "downtown" hotel. Sheraton concedes that the Sheraton South is closer to the city center than the Music City Sheraton and that the Music City Sheraton was listed first. Additionally, the deactivated Sheraton Nashville was listed second.[3] Therefore, the Sheraton South, the hotel closest to the city center, was third in the reservation system's listing of hotels for Nashville. Sheraton argues that this error was inadvertent and it was corrected on December 7, 1987. Sheraton also states that the improper order again occurred on November 22, 1988, and lasted for seven days until it was corrected on November 29, 1988.
 
 
 22
 We find that the district court's conclusion that Sheraton breached its duty of good faith and fair dealing was not clearly erroneous. Pacific Eastern introduced the testimony of several individuals who, when they contacted the 800 number and asked for a hotel in Nashville, were first given the Music City Sheraton and on several occasions were not even told that another Sheraton was located in the Nashville area. On one occasion, the caller asked if there was another hotel farther outside of town and was informed that there was another Sheraton "down south someplace" but that it was "far away from everything." (App. 272). On another occasion, the caller was informed that the Sheraton South was 15 miles from downtown and approximately 15 to 20 miles from the Grand Ole Opry. The Sheraton South is approximately seven to eight miles from downtown. (App. 240). On several occasions, Sheraton was informed of the inaccuracies of the reservation listings, both orally and in writing, but the problem was not corrected.
 
 D. Calculation of Damages
 
 23
 Having determined that the district court was not clearly erroneous in concluding that Sheraton breached its duty of good faith and fair dealing by manipulating the reservation listing for the 800 number, we turn to the question of damages. Pacific Eastern urged the court to award an amount which would compensate it for the overall decline in total occupancy rate after 1985. Plaintiff presented evidence that this amount would be $547,719, less 30 percent cost, or $383,403. The district court found that it would be inappropriate to use the overall occupancy rate to calculate damages because other factors could have contributed to the decline in occupancy, including market fluctuations and the opening of several new hotels in Nashville between 1985 and 1987. Instead, the court focused on the decline in the number of reservations provided through the 800 number. Initially, the district court concluded "that the percentage of room nights provided by Sheraton reservation system telephone operators decreased from around 14 percent in 1984 and 1985 to 8.6 percent in 1988. That amounts to a reduction of approximately 38.5 percent." (App. 94-95) (footnote omitted). The court then used 1984 as a base year and concluded that Pacific Eastern lost $296,716 in gross revenues through Sheraton's bad faith actions. After deducting 30 percent for costs, the court awarded plaintiff $207,697 as "a good approximation of Pacific Eastern's loss of profits attributable to Sheraton's manipulation of the reservation system." (App. 95).
 
 
 24
 Sheraton filed a motion pursuant to Federal Rule of Civil Procedure 52(b), arguing that the calculation used by the court improperly compensated the plaintiff for the overall downturn in the business, something the district court had expressly stated it did not wish to do. The district court agreed that its calculations were improper and recalculated the damages. Under its initial calculations, the district court derived the percentage of rooms provided by the 800 number reservation system by comparing the number of rooms booked through the system to the total number of rooms available for occupancy at the Sheraton South. On recalculation, the district court derived the percentage of rooms provided by the reservation system by comparing the number of rooms booked through the system to the total number of rooms occupied at the Sheraton South. After deducting 30 percent for costs, the district court awarded plaintiff $108,866.55. The district court felt this calculation eliminated those losses in revenue that were the result of factors other than the defendant's bad faith actions.
 
 
 25
 Initially, plaintiff argues that defendant should not have been allowed to offer this post-trial theory, because at trial defendant failed to attack the estimation of damages offered by the plaintiff. We reject this argument. While this is an example of why a defendant is better off discussing the issue of damages at trial rather than remaining silent in fear of appearing to admit liability, in this case we do not see defendant's failure to do so as fatal. The district court set out its goal in calculating damages; defendant's motion merely clarified for the court why the method chosen did not achieve the court's stated goal. This was a proper use of a motion pursuant to Federal Rule of Civil Procedure 52(b).
 
 
 26
 Defendant argues that plaintiff should not be awarded damages for the alleged loss of room nights in 1988 because it corrected the order of listings on December 7, 1987. The district court did not find that defendant had corrected the listings, and the evidence in the record cited by defendant to support its argument on appeal does not show that the district court's ruling was clearly erroneous.[4]
 
 
 27
 Turning to the actual calculations, we agree with the defendant that the initial calculation by the district court was incorrect insofar as it included compensation for the overall downturn in the Nashville hotel economy. However, we also agree with the plaintiff that the recalculation done by the district court is incorrect in that it does not fully compensate the plaintiff for the loss caused by Sheraton's bad faith actions. The district court, using 1985 as a base year, determined that the 800 number provided 26.5 percent of the total rooms occupied. It then calculated for each year 26.5 percent of the total rooms that were actually occupied--this being the number of rooms that the 800 number should have provided. The court awarded plaintiff the difference between the number of rooms the 800 number actually provided and the number of rooms that should have been provided. The flaw in this calculation occurred when the district court multiplied 26.5 percent by the total number of rooms actually occupied for each year. The total number of rooms occupied already had been reduced by defendant's bad faith actions; therefore, the defendant necessarily benefited from using the total number of rooms occupied to determine the 26.5 percent that the 800 number should have provided.
 
 
 28
 The more appropriate comparison is between the number of rooms provided through the 800 number and the number of rooms provided through other sources. Using 1985 as a base year, we must first determine what percentage of rooms the 800 number provided, compared to room reservations from other sources. In 1985, the 800 number provided 7,601 room nights, while non-800 number sources provided 21,048 room nights. Thus, we can assume that, had the listings in Sheraton's computer not been tampered with, the 800 number would have continued to provide, on average, 36 percent of the number of rooms the non-800 number sources provided. Based on these assumptions, the following table calculates the number of room night reservations that were lost due to Sheraton's actions:
 
 
 29
 Number of room Rooms that Rooms
 
 
 30
 Year reserv. provided should have that were Lost
 
 
 31
 from non800 sources been provided provided Rooms
 
 
 32
 ---- ------ ------- ----- ----
 
 
 33
 1986 21,265 x .36 = 7,655 - 6,303 = 1,352
 
 
 34
 1987 17,780 x .36 = 6,401 - 4,837 = 1,564
 
 
 35
 1988 18,724 x .36 = 6,741 - 4,724 = 2,017
 
 
 36
 Multiplying the number of lost room nights for each year by the average room rate for that year yields the gross revenue plaintiff lost: $210,368.06.[5] Subtracting 30 percent for costs results in total net revenue loss of $147,257.64. This calculation takes into account the general downturn in the hotel business in the Nashville area as reflected by the decrease in reservations from sources other than the 800 number, without using the decrease in 800 number reservations to the advantage of defendant. Therefore, we find that the district court should have awarded plaintiff $147,257.64 instead of $108,866.55.[6]
 
 E. Defendant's Counterclaim
 
 37
 The district court awarded Sheraton Corporation unpaid fees of $19,387.96. Plaintiff argues that defendant's breach of the duty of good faith and fair dealing, just as any breach of contract, relieved it of its obligations under the contract. Plaintiff also disputes a large portion of the amount, arguing that it never received the services at issue and that some of the equipment provided did not function properly. Once plaintiff has been awarded damages to make it whole, defendant is entitled to offset that amount by the unpaid fees. We affirm the district court's award to defendant on its counterclaim.
 
 III.
 
 38
 In summary, we find that plaintiff is entitled to $147,257.64, offset by the damages awarded to defendant on its counterclaim of $19,387.96, for a total judgment against the defendant of $127,869.68. We REMAND to the district court with directions to enter judgment in that amount.
 
 
 
 *
 The Honorable Nancy G. Edmunds, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Sheraton Corporation received fees from the Music City Sheraton of approximately $350,000 in 1985, $529,000 in 1986, $531,000 in 1987, and $509,000 in 1988. In contrast, Sheraton received a total of approximately $750,000 in franchise fees from the Sheraton South over a 15-year period
 
 
 [2]
 Sheraton attempted to terminate the agreement for cause effective November 30, 1988. Under the agreement, it had an absolute right to terminate effective March 1, 1989
 
 
 [3]
 The Sheraton Nashville was another franchise Sheraton, located close to the center of the city. The Sheraton Nashville went bankrupt in 1987
 
 
 [4]
 The evidence that defendant cites is cryptic at best. There are several handwritten pages stating the order of listings on various dates (app. 970-73, 1027-29) and testimony from a Sheraton employee, Robert Furello, explaining the handwritten notes. Even according to these notes, between December 7, 1987, and November 22, 1988, the Sheraton South was listed second, after the deactivated Sheraton Nashville. Only after November 30, 1988, were the listings in the correct order, with the Sheraton South first, the Music City Sheraton second, and the deactivated Sheraton Nashville last. The court did not grant damages for 1989
 
 
 [5]
 The average room rates for 1986, 1987, and 1988 were $41.75, $43.09, and $42.90, respectively: (1352 X $41.75) + (1564 X $43.09) + (2017 X $42.90) = $210,368.06
 
 
 [6]
 Defendant presents other arguments concerning various factors that could have contributed to the decline in reservations for the Sheraton South through the 800 number. Defendant failed to rebut plaintiff's damage theories or present evidence to support such theories. Therefore, we consider these arguments to be raised for the first time on appeal and, as such, they are not properly before the court. Boone Coal & Timber Co. v. Polan, 787 F.2d 1056 (6th Cir.1986)